UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

JOSEPH ANDREW MIRARCHI,          :
                                 :
              Petitioner,        :
                                 :   CIVIL NO. 1:CV-08-1712
        vs.                      :
                                 :   (Judge Caldwell)
RANDALL BRITTON, et al.,         :
                                 :
              Respondents.       :


*M E M O R A N D U M*

I.    *Introduction*

        Joseph A. Mirarchi, incarcerated at SCI-Houtzdale in
Houtzdale, Pennsylvania, has filed a counseled petition for writ
of habeas corpus pursuant to 28 U.S.C. § 2254. Mirarchi is
challenging his 2000 convictions in the Court of Common Pleas of
Northumberland County, Pennsylvania, for third-degree murder,
aggravated assault, and reckless endangerment. He was convicted at
a jury trial and is serving a twenty- to forty-year term of
imprisonment.

        The petition makes two claims for relief. First, trial
counsel was ineffective in not objecting when the prosecutor
violated Petitioner's Fifth Amendment right to remain silent. This
claim is based on testimony the prosecutor elicited at trial from
two police officers that Petitioner refused to give a written

statement that would have reduced to writing the voluntary oral statement Petitioner had already given. Second, trial counsel was ineffective in failing to object to the prosecutor's remarks during closing argument that violated Petitioner's Fifth Amendment right to remain silent and his Sixth Amendment right to counsel. This claim is based on the prosecutor's references in his closing both to the testimony of the two police officers and to Petitioner's request for a lawyer while giving his oral statement.

In opposing the petition, Respondents run the gamut of objections to a habeas petition; it is barred by the statute of limitations; Petitioner failed to exhaust his state-court remedies; Petitioner has presented a mixed petition (which contradicts the previous argument); Petitioner procedurally defaulted his claims; and the claims lack merit in any event.

We conclude that we can reach the merits of Petitioner's claims but that the petition must be denied.

II.   *Background*

Petitioner does not dispute that he fired the shot that killed Robert Deitz in the early morning hours of September 3, 1999, after a physical altercation in a Mount Carmel bar, with the deadly encounter happening on the street minutes afterward. But as he testified at his September 2000 trial, he alleged that the gun

-2-

went off accidentally. The jury did not believe him and found him guilty of third-degree murder, aggravated assault, and reckless endangerment.[1] He was sentenced to twenty- to forty-years imprisonment, with the judgment of sentence entered on January 12, 2001. (Doc. 1, Ex. A, Mirarchi's Direct Appeal, CM/ECF p. 1).[2]

Shortly after the shooting, Petitioner was arrested at his house and was taken to the Mount Carmel police department. He was mirandized and agreed to give an oral statement. Lt. Blaine Handerhan of the Mount Carmel police conducted the interview and Todd Owens, a Mount Carmel police officer, was an observer. Petitioner had paper bags over each hand so that he could be tested for gunshot residue.

At the trial, as part of the Commonwealth's case, the prosecutor presented the testimony of these two officers concerning the interview. In pertinent part, Owens testified that Petitioner said the following. Petitioner was at the bar on the night of September 2 with his .40-caliber Glock handgun on him. (Doc. 18-2, CM/ECF pp. 63-64).[3] The victim beat him up and knocked

---

[1] Petitioner was also facing a charge of first-degree murder.

[2] We rely in part on the CM/ECF pagination in citing documents.

[3] September 2 was a Thursday.

him to the floor. (*Id.*, p. 63).[4] When he was knocked to the floor, his gun fell out. (*Id.* p. 64). Petitioner left the bar, and the victim followed him to an alley. (*Id.* pp. 63, 64). In the alley, the victim knocked him to the ground, and the gun fell out again. (*Id.*, p. 64). "[A]s he was getting up off of the ground and attempting to put the gun away, the gun discharged striking Mr. Deitz." (*Id.*, p. 65). Petitioner said the gun was in his hand when it went off. (*Id.*).

Petitioner also said the gun was at his house and that the police could go get it. (*Id.*). He then signed a consent to search his house for the gun. (*Id.*).[5] The following exchange then took place on direct examination:

> Q. Was there any further questioning with regard to the incident that you recall?
>
> A. After the permission to search form was signed, it was somewhere around there that Lieutenant Handerhan asked him to put down his

---

[4] The victim was at the bar with his girlfriend. Petitioner had known and worked with the girlfriend's father. (Doc. 19-4, CM/ECF pp. 23-24). Petitioner testified that the victim started making rude comments to him because Petitioner had supposedly told the girlfriend he did not think the victim was the right choice for her. (*Id.*, p. 24). The girlfriend testified that immediately before the altercation in the bar that night Petitioner called the victim a "f___king punk." (Doc. 18-5, CM/ECF pp. 35-36). Petitioner admitted he might have said "punk" that night. (Doc. 19-4, CM/ECF p. 25).

[5] Petitioner's hands were bagged, but on cross-examination it was established that the bag on his writing hand was removed for the time it took to sign any forms. (*Id.*, p. 84).

statement in writing of what he had just told us.

    Q. Lieutenant Handerhan asked the defendant to give a written statement?

    A. Yes, or he also gave him the option that if he did not want – if he could not write it, that Lieutenant Handerhan would write it. He could read it and sign it.

    Q. What was Mr. Mirarchi's response to the request to do a written statement?

    A. He said he just told Lieutenant Handerhan what had happened, and he wasn't going to put anything in writing.

(Doc. 18-2, p. 66).

On cross-examination, trial counsel brought up the issue of a written statement. Owens acknowledged that he had not noted in his written report a refusal by Petitioner to give a written statement. (*Id.* p. 93). He also acknowledged that when he testified at Petitioner's preliminary hearing, he said that Petitioner had complied with all of his commands that night, without qualifying it by noting an exception for not making a written statement. (*Id.* p. 92). Owens explained that the preliminary-hearing question was in a different context. (*Id.* p. 92).

The same topic was addressed during Handerhan's testimony. Handerhan gave essentially the same account of Petitioner's statement as recounted by Owens. Handerhan testified

that Petitioner said that Deitz hit him in the bar and knocked him to the floor. His gun fell out and Petitioner picked it up and put it back in his coat. Petitioner left the bar and then Deitz did. Deitz followed him to the alley where Deitz hit him again and knocked him to the ground. The gun fell out of his coat pocket again and while Petitioner was attempting to pick the gun up, it went off, striking Deitz. (Doc. 19, CM/ECF pp. 42-43, 65-66). Petitioner admitted the gun was in his hand when it went off. (*Id.* p. 43).

> The following exchange took place on direct examination:
>
> Q. Was there any other questioning of him at that point?
>
> A. I then asked him if he would want to write us a statement, and he indicated no. I said, Well, you know, we could write the statement for you, and then you could sign it. And he said, Blaine, I told you what happened. And he sort of leaned back in his chair, he said, Blaine, I told you what happened, you know what happened, and I'm not going to tell you it again. And at that point, I ended my questioning . . . .

(Doc. 19, p. 44).

Trial counsel again cross-examined about a written statement, and Handerhan admitted that he testified at the preliminary hearing that he "did not bother to have" Petitioner "write anything out," but stated that he meant that he did not have Petitioner write anything out at the beginning of the

interview, "right after the Miranda" warnings, because his hands were bagged. (*Id.*, p. 75). On redirect examination, Handerhan read from a supplemental report he had made about Petitioner's oral statement in which Handerhan wrote that Petitioner stated he would "not tell[ ] it again in response to Handerhan's request that he "write a statement as to what happened." (*Id.*, p. 83).

At the trial, Petitioner testified in his own defense as follows. Deitz struck him and knocked him to the floor. Petitioner was told to leave the bar. His gun had fallen on the floor, and he retrieved it and left. Deitz then left the bar. He began following Petitioner and threatening him with a beating, using a conversational tone. When they came to the alley, Deitz leaned against a building and put his foot up against it. Deitz pushed off from the building with his foot, and Petitioner thought he was going to grab him. Petitioner pulled the gun out at that time and warned Deitz off. Deitz started backing away, and so did Petitioner. Deitz then said, "What are you going to do, shoot me and spend the rest of your life in jail?" Deitz started backing up, and Petitioner kept the gun pointed in his direction. Petitioner decided to turn around, and as he turned around, Petitioner was pulling his coat "and that's when the gun went off." (Doc. 19-4, CM/ECF pp. 26-30). Petitioner denied firing the

gun intentionally and that he "was shocked and stunned that the gun even went off." (*Id.*, p. 30).

Petitioner also testified about the statement he gave police after the shooting. In his version, he said that he had told the police the victim had knocked him off his bar stool and that his gun had fallen out. Petitioner retrieved it and put it back in his coat. (*Id.*, p. 43). He was then thrown out of the bar. (*Id.*). He denied that he told the officers that the gun had also fallen out in the alley. (*Id.*, p. 44). In fact, he never told the officers what happened in the alley because he had overheard the chief of police say that "he's dead" and that they would charge "him" with first-degree murder. (*Id.*, p. 43). At that point, Petitioner testified that he said that he needed a lawyer and they returned him to his cell. (*Id.*, p. 44). He denied refusing to put anything in writing, noting that his statement had not been videotaped although there was a video camera in the room. (*Id.*, p. 45).

As part of its case in chief, the Commonwealth presented the testimony of two disinterested witnesses, a couple who happened to be sitting on their porch who saw Petitioner and Deitz walking along the street after the latter left the bar. Essentially, both of these witnesses testified that Petitioner and the victim appeared to be just two friends walking and conversing

as they approached the alley. Deitz entered the alley and placed his foot up against the building. Petitioner followed him. After a few minutes, Deitz began to leave the alley. Petitioner turned his body in Deitz's direction, and the witnesses could see a gun in Petitioner's hand by his side. Deitz turned back toward Petitioner and said, "What are you going to do, shoot me and spend the rest of your life in jail?" The witnesses testified that Deitz then turned his back to Petitioner and began walking away, and at that point, Petitioner raised the gun and shot Deitz. (Doc. 18, pp. 58-71; doc. 19-2, pp. 11-17). The autopsy established that he was shot in the back right side of the head. (Doc. 19, p. 591).

In his closing, trial counsel questioned the thoroughness of the investigation and also challenged the credibility of Handerhan and Owens, noting the failure to record Petitioner's statement. (Doc. CM/ECF pp. 12-13).

As part of his closing, the prosecutor made the following remarks:

> "There was a fight and the gun fell and it went off." That's the first statement. I believe three officers testified to that. It's your recollection that controls, not mine.

> Well then he's taken back to the Mt. Carmel Police Department, and he's interviewed. And in the interview room is Officer Todd Owens taking notes and Officer Blaine Handerhan. And they begin to ask him questions and try and empathize with him.

In any criminal investigation, before you do anything else, tape, record, write, you do a pre-interview to find out what is going on.

And Mr. Mirarchi gives a statement and the statement is very similar to the statement that he gave to the police at the scene. He talks about the fight in the bar, except he says that Deitz started it, that Deitz started the fight. Deitz was the one who started it.

He talks about walking around the corner. He talks about the gun falling and going off, and he's asked, "Was it in your hand?" "Yeah, it was in my hand."

On the stand here he said he asked for an attorney. And when somebody asks for an attorney that ends the interview. You cannot interview someone anymore.

Officer Handerhan said he refused to write out a statement. There were notes taken at the time by Officer Owens of that statement. It is consistent with what the officer said happened at that scene. It is not consistent with what the defendant said the next time he was interviewed by his doctors.

By that time he had gone through a preliminary hearing, and it was six months later, and he had a lot of time on his hands to think about it.

(Doc. 19-5, pp. 46-47).

Petitioner took a direct appeal, raising seven claims of ineffective assistance of counsel. On November 6, 2003, the Superior Court of Pennsylvania dismissed these claims without prejudice to presenting them in a postconviction petition. (Doc. 1, Ex. A, *Commonwealth v. Mirarchi*, No. 1235 MDA 2002 (Pa. Super.

-10-

Nov. 6, 2003). Mirarchi did not petition the Pennsylvania Supreme Court for allowance of appeal.

On March 8, 2004, Petitioner filed with the trial court a timely petition for collateral relief under the Pennsylvania Post Conviction Relief Act (PCRA), 42 Pa. C.S. §§ 9541-9546. Among other claims, Petitioner raised the ones he has presented in the instant 2254 petition. The trial court held a hearing at which PCRA counsel asked trial counsel why he had not objected to the police officers' testimony that Petitioner refused to put his oral statement in writing:

> Q: . . . Let me just ask you flat out -- what - what your basis was for not objecting to the references to Mr. Mirarchi's refusal to give a written statement?
>
> A: At the time of the preliminary hearing, the officers indicated that Mr. Mirarchi was not asked to give a written statement. And I was making a point, part of the theme of the case was the lack of quality of the investigation, that a lot of things that should have been done, most specifically, the blood draw that was not done to establish his blood alcohol level, that other things, as far as the quality of the investigation, were not done in this case.
>
> The officer at the preliminary hearing testified that he was not asked to give a written statement because, quote, unquote, his hands were bagged. They then changed their testimony to testify to these events at the time of the preliminary -- at the time of the trial.

I wanted to contrast with the jury --
credibility in this case, as far as Joe's
demeanor, how he was behaving himself, what he
was doing, what he wasn't doing was very
important. And part of the theme was that the
police were trying to demonize him, as I think
to use a phrase from one of your pleadings in
this case, and trying to put every bad
possible spin on his behavior.

I wanted them to claim that he had failed
to give a written statement and be able to
show the jury that, in fact, he was never even
asked to give a written statement and that the
officers indicated that the reason he wasn't
asked were that his hands were bagged,
alerting the jury to the possibility that they
were not credible on the issue of whether or
not he was asked to give a written statement.

And if they're not credible on that basic
procedure, not credible in describing Joe's
demeanor and his behavior on that issue, that
there are other things that could be called
into question.

(Doc. 16-2, CM/ECF pp. 19-20). Trial counsel also indicated that

an objection would have contradicted his position at trial that

Petitioner was "being as cooperative as possible." (*Id.*, p. 21).

On March 6, 2006, the trial court denied PCRA relief.

(Doc. 1, Ex. B, PCRA opinion). The court accepted that there was a

Fifth Amendment violation, but applying state law dealing with an

ineffectiveness claim, *Commonwealth v. Spotz*, 582 Pa. 207, 220-21,

870 A.2d 822, 829-30 (2005), concluded in part that trial counsel

had a "reasonable basis," *id.* at 220, 870 A.2d at 830, in allowing

the questioning because it allowed him to attack the officers'

-12-

credibility by pointing to inconsistent statements they made at the preliminary hearing. (Doc. 1, Ex. B, p. 7). The same reasoning was used to reject the claim concerning the prosecutor's closing argument. (*Id.*).[6]

Petitioner appealed to the Superior Court, which affirmed on July 25, 2007. *See Commonwealth v. Mirarchi,* 596 MDA 2006 (Pa. Super. July 25, 2007). The superior court also applied state law on ineffectiveness claims. On the officers' testimony, the reasoning was the same as the trial court's. Counsel had a reasonable basis for not objecting; if he had objected, he would not have been able to impeach the officers with their preliminary-hearing testimony. (Doc. 1, Ex. C, p. 10). On the reference in the prosecutor's closing to the officers' testimony that Petitioner refused to give a written statement, the court ruled that it was a

_____

[6] The Pennsylvania Supreme Court has phrased the state test for ineffective assistance of counsel as follows:

> [T]he constitutional ineffectiveness standard requires the defendant to rebut the presumption of professional competence by demonstrating that: (1) his underlying claim is of arguable merit; (2) the particular course of conduct pursued by counsel did not have some reasonable basis designed to effectuate his interests; and (3) but for counsel's ineffectiveness, there is a reasonable probability that the outcome of the proceedings would have been different.

*Id.* at 220, 870 A.2d at 830. Failure to satisfy any of the prongs requires rejection of the claim. *Id.*, 870 A.2d at 830.

fair response to trial counsel's argument that the officers were not credible because they had given inconsistent testimony. The court cited *Commonwealth v. Copenhefer*, 553 Pa. 285, 719 A.2d 242 (1998), in support of this conclusion.

Petitioner filed a petition for allowance of appeal with the Pennsylvania Supreme Court, which that court denied on December 13, 2007. *See Commonwealth v. Mirarchi,* 595 Pa. 706, 938 A.2d 1052 (2007)(table). The instant petition was filed on August 9, 2008.

III. *Discussion*

A. *The Petition Is Not Time-Barred*

The procedural history of this case establishes that Petitioner did not procedurally default his claims nor has he presented a mixed petition, or one that contains unexhausted claims, so we need only address the statute-of-limitations issue.[7]

Respondents assert that Petitioner failed to meet the one-year statute of limitations for filing a 2254 petition. A

---

[7] It could be thought that Petitioner failed to exhaust his Sixth Amendment claim since the state-court opinions speak only about the right to remain silent. However, Petitioner asserts he has exhausted state-court remedies on all claims and Respondents do not dispute this. (Doc. 1, Petition ¶ 13(a); doc. 13, Answer 13(a)). In any event, exhaustion is not required if the court is going to deny the petition, 28 U.S.C. § 2254(b)(2), and the reason for denying the Fifth Amendment claim applies equally to a Sixth Amendment one.

petitioner confined under a state-court judgment has one year to file a 2254 petition challenging the judgment. 28 U.S.C. § 2244(d)(1). As relevant here, the limitations period runs from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." *Id.* at § 2244(d)(1)(A). This language applies to the right to seek discretionary review in state appellate courts and means that the judgment does not become final until the time period for seeking such review expires, even if review is not sought. *See Swartz v. Meyers*, 204 F.3d 417, 421 (3d Cir. 2000).

The limitations period is tolled for the "time during which a *properly filed* application for State post-conviction relief or other collateral review with respect to the pertinent judgment or claim is pending." 28 U.S.C. § 2244(d)(2)(emphasis added). The limitations period is thus tolled for the time an application for discretionary review is pending in an appellate court of the denial of postconviction relief, *see Kindler v. Horn*, 542 F.3d 70, 77 n.5 (3d Cir. 2008)(noting that the petitioner's PCRA petition was pending at least through the date the Pennsylvania Supreme Court denied his petition for review), *cert. granted*, 129 S.Ct. 2381, 173 L.Ed.2d 1292 (U.S. May 18, 2009)(No. 08-92), but it would not be tolled for the time the petitioner would have for seeking certiorari review from the United States

-15-

Supreme Court. *See Lawrence v. Florida*, 549 U.S. 327, 329, 127

S.Ct. 1079, 1081, 166 L.Ed.2d 924 (2007)(a state application for

postconviction relief is not pending under section 2244(d)(2)

"when the state courts have entered a final judgment in the matter

but a petition for certiorari has been filed" in the Supreme

Court).

Applying these principles here indicates the 2254

petition is timely. On direct appeal, the superior court affirmed

Mirarchi's conviction on November 6, 2003. Mirarchi did not seek

review in the Pennsylvania Supreme Court, so his conviction became

final on December 8, 2003, the day on which his thirty-day period

for seeking discretionary review in the Pennsylvania Supreme Court

expired.[8] Thus, the statute of limitations began running on that

date, and ran for ninety-one days until it was tolled on March 8,

2004, when Petitioner filed his timely PCRA petition.[9]

The trial court denied postconviction relief on March 7,

2006, the superior court affirmed the trial court's decision on

July 25, 2007, and Mirarchi petitioned for allowance of appeal

---

[8] *See* Pa. R. App. P. 1113(a). The thirty-day period ended on a
Saturday. In those circumstances, Pennsylvania law extended the deadline
to Monday, December 8. *See* Pa. R. App. P. 107; 1 Pa. C.S. § 1908.

[9] State law is similar to federal law in allowing a PCRA petitioner
one year to file a PCRA petition from the date the judgment becomes
final, generally defined as the conclusion of direct review, including
discretionary review in the appellate courts, or the expiration of the
time for seeking such review. *See* 42 Pa. C.S. § 9545(b)(1) and (3).

with the state supreme court. That court denied the petition on December 13, 2007, so the limitations period began running again on that date. At that point, Petitioner had 275 days left in the limitations period (calculated by subtracting ninety-one days from the original deadline of December 8, 2004), which gave Petitioner until September 15, 2008, to file his 2254 petition.[10] The petition was filed on August 9, 2008, and it was thus timely.

Respondents seek to avoid this result by arguing that Petitioner's failure to seek review in the state supreme court of the superior court's denial of his direct appeal means that the statute should not be tolled for the time the PCRA proceedings were pending. The argument is a bit incoherent, but it seems to be that Petitioner's PCRA proceedings were not "properly filed," as required by section 2244(d)(2), when Petitioner failed during his direct-appeal proceedings to pursue discretionary review in the state supreme court. (Doc. 13, Rpts.' answer ¶ 18).

We reject this argument, as it ignores section 2244(d)(2)'s language, which plainly does not require that a habeas petitioner pursue all avenues available on direct appeal, only that the postconviction application be "properly filed,"

_____

[10] The deadline actually fell on September 13, a Saturday, but federal law extended the deadline until Monday, September 15. *See* Fed. R. Civ. P. 6(a)(3).

generally meaning that "its delivery and acceptance are in compliance with the applicable laws and rules governing filings." *Artuz v. Bennett*, 531 U.S. 4, 8, 121 S.Ct. 361, 364, 148 L.Ed.2d 213 (2000). Respondents make no argument that Mirarchi's PCRA petition was improperly filed under state law, and hence in accord with section 2244(d)(2), his PCRA proceedings toll the federal limitations period.[11] To the extent the argument is made, it appears to be that Petitioner had to "exhaust" state-court remedies by seeking discretionary review in the state supreme court before filing a postconviction application. However, Respondent points to no provision of state law prohibiting the filing of a PCRA petition if discretionary review in the state supreme court on direct appeal is not pursued first. In fact, in the context of exhaustion under federal habeas law, Pennsylvania law is the opposite, specifically allowing a petitioner to exhaust state-court remedies without requiring him to seek discretionary review in the state supreme court. *See Lambert v. Blackwell*, 387 F.3d 210, 233 (3d Cir. 2004)(citing *In re Exhaustion of State Remedies in Criminal and Post-Conviction Relief Cases,* No. 218 Judicial Administration Docket No. 1 (Pa. May 9, 2000)).

---

[11] Respondents cite *Hill v. Keane,* 984 F. Supp. 157 (E.D.N.Y. 1997), in support of their argument, but that case was abrogated in *Bennett v. Artuz,* 199 F.3d 116, 122 (2d Cir. 1999), which was subsequently affirmed by the Supreme Court in *Artuz*, *supra.*

B. *The Merits*

We begin our analysis by stating our standard of review. We can grant this 2254 petition only if the superior court decision denying postconviction relief "resulted in a decision that . . . involved an unreasonable application of [ ] clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).[12] "[A] state court ruling is considered an 'unreasonable application' if the state court unreasonably applies the correct legal rule to the particular facts, unreasonably extends a legal principle to a new context, or unreasonably refuses to extend the principle to a new context where it should apply." *McMullin v. Tennis*, 562 F.3d 231, 236 (3d Cir. 2009)(cited cases omitted), *petition for cert. filed*, (U.S. April 28, 2009)(No. 08-10148). "The unreasonable application test is an objective one - a federal court may not grant habeas relief merely because it concludes that the state court applied federal

---

[12] "In considering a § 2254 petition, we review the 'last reasoned decision' of the state courts on the petitioner's claims." *Simmons v. Beard*, ___ F.3d ___, ___, 2009 WL 2902251 at *6 (3d Cir. 2009) (quoting *Bond v. Beard*, 539 F.3d 256, 289-90 (3d Cir. 2008), *petitions for cert. filed*, 77 U.S.L.W. 3577 (U.S. April 6, 2009)(No. 08-1242), and (U.S. May 6, 2009)(No. 08-10282)).

law erroneously or incorrectly." *Jacobs v. Horn,* 395 F.3d 92, 100

(3d Cir. 2005)(cited cases omitted).[13]

Additionally, in this case, Petitioner is presenting a

*Strickland* claim, that trial counsel violated his Sixth Amendment

right to counsel by providing ineffective assistance of counsel, a

claim governed by standards established in *Strickland v.*

*Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

"[B]ecause the *Strickland* standard is a general standard, a state

court has even more latitude to reasonably determine that a

defendant has not satisfied that standard." *Knowles v. Mirzayance*,

___ U.S. ___, ___, 129 S.Ct. 1411, 1420, 173 L.Ed.2d 251 (2009).

Thus habeas review of a *Strickland* claim is "doubly deferential."

*Id.* at ___, 129 S.Ct. at 1420. We turn now to the merits.

We begin by noting that although the superior court

relied on state law dealing with an ineffectiveness claim, that

---

[13] Habeas relief may also be granted in two other circumstances.
First, the court may grant relief if the state-court proceedings
"resulted in a decision that was contrary to . . . clearly established
Federal law, as determined by the Supreme Court of the United States. *Id.*
at § 2254(d)(1). A state court judgment is "contrary to" federal law when
it is "diametrically different, opposite in character or nature, or
mutually opposed" to "clearly established" decisions of the United States
Supreme Court. *Williams v. Taylor,* 529 U.S. 362, 405, 120 S.Ct. 1495, 146
L.Ed.2d 389 (2000). Second, habeas relief may also be granted if the
state-court proceedings "resulted in a decision that was based on an
unreasonable determination of the facts in light of the evidence
presented in the State court proceeding." *Id.* at § 2254(d)(2). These
provisions do not apply here because Petitioner does not argue that the
superior court's opinion was contrary to clearly established Supreme
Court precedent or based on an unreasonable determination of the facts.

law is "not contrary to *Strickland*." *Jacobs v. Horn*, 395 F.3d 92, 106 n.9 (3d Cir. 2005). Hence, "the relevant question here is whether the [superior court's] decision involved an unreasonable application of *Strickland*." *Id.*

Petitioner asserts that trial counsel was ineffective in not objecting when the prosecutor violated his Fifth Amendment right to remain silent when he elicited the trial testimony of officers Handerhan and Owens that Petitioner refused to give a written statement, a statement that would have reduced to writing the voluntary oral statement Petitioner had already given.[14] Petitioner claims he was prejudiced by this testimony in two ways. First, it undercut his voluntary cooperation and truthfulness after being taken into custody. Second, the prosecutor used this evidence to imply that Petitioner's oral statement was false. otherwise, why would he have not agreed to put it in writing? In turn, the refusal to make a written statement implied a consciousness of guilt.

---

[14] It is unsettled whether introducing evidence that a defendant refused to give such a written statement is an improper comment on a defendant's invocation of his right to remain silent. *Compare Crosby v. State*, 366 Md. 518, 530-31, 784 A.2d 1102, 1108-09 (2001) (testimony that a defendant "refus[ed] to put into writing that which had already been spoken" was not a violation of the right to remain silent) *with United States v. Jenkins*, 499 F. Supp. 2d 1268, 1276-77 (M.D. Fla. 2007) (testimony that a defendant refused to reduce his oral statement to writing implicated Fifth Amendment right to remain silent). We need not decide this issue to resolve the habeas petition.

As noted, trial counsel testified at the state postconviction hearing that he did not object to this line of questioning as part of his trial strategy. That strategy included attacking the credibility of the officers. To accomplish that, he wanted the officers' responses on the record so that he could impeach them with their testimony at the preliminary hearing that no such written statement was requested.

The superior court concluded that this provided a "reasonable basis" for trial counsel's conduct and rejected the claim. Petitioner asserts that there could not have been a reasonable basis to allow this testimony because the officers' testimony at the preliminary hearing did not contradict their trial testimony, or at least could be plausibly explained away by them, and was in fact explained away by them at trial.[15] Hence, allowing the testimony that he refused to make a written statement was deficient performance that actually hurt Petitioner's credibility. In the absence of this improper testimony, Petitioner argues, there was a reasonable probability that the jury would not have returned a verdict of third-degree murder.

---

[15] As noted, Handerhan testified his preliminary-hearing testimony that he had not requested a written statement had come at the beginning of the interview. The significance of Petitioner's hands being bagged was lessened by evidence that he had removed the bag from his writing hand during the interview to sign any forms.

*Strickland* sets forth a two-prong test to establish ineffective assistance of counsel. First, counsel's performance must be deficient. Trial counsel's representation must have fallen "below an objective standard of reasonableness considering all the circumstances." *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005)(citing *Strickland*). "Counsel's reasonableness must be assessed on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* Second, counsel's deficient performance must have prejudiced the defense. *Id.* (quoting *Strickland*). A petitioner must "show 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* at 105 (quoting *Strickland*). A petitioner "need not show that counsel's deficient performance 'more likely than not altered the outcome in the case' – rather, he must show only 'a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland*). "This standard is not a stringent one." *Id.* (quoted case and internal quotation marks omitted).

We conclude that the superior court's ruling does not involve an unreasonable application of *Strickland*'s first prong, which require us to examine the circumstances confronting counsel at the time he made his decision not to object. Petitioner was not contesting that he shot the victim, only that the shooting had not

been premeditated and was in fact accidental. His testimony was that the victim was the aggressor and that Petitioner pulled his gun out in the alley, and kept it trained on Deitz, when Deitz pushed off from the wall, thinking that Deitz was going to grab him. Seeing Deitz starting to back up, Petitioner decided to turn around, and as he did so, he was pulling his coat, "and that's when the gun went off."

This testimony closely tracked the testimony of the two third-party witnesses (with the crucial exception that the witnesses said that Petitioner had simply raised the gun and shot the victim as the victim turned his back to Petitioner and began walking away). However, it had its difficulties in light of the testimony of the two police officers concerning the oral statement Petitioner gave immediately after the shooting, testimony that was admissible regardless of whether they should have also been allowed to testify that Petitioner refused to make a written statement. Most significantly, the officers both testified that Petitioner said that Deitz had knocked him down twice, once in the bar and then in the alley, and that both times his gun had fallen out, with the gun going off accidentally while Petitioner was attempting to pick it up in the alley, striking Deitz. The officers' testimony strongly suggested that Petitioner's trial

testimony was not credible and that Petitioner had changed his story to account for later, contradictory evidence.

As trial counsel stated at the postconviction hearing, and as the superior court concluded, one reasonable strategy was to challenge the officers' credibility, and that could be done by pointing to prior inconsistent statements about whether they had asked Petitioner to give a written statement, a strategy that could be accomplished by letting them testify that Petitioner refused to reduce his oral statement to writing. As habeas counsel points out, this strategy had evidentiary weaknesses, but it was nonetheless reasonable given the circumstances. It follows that we cannot disturb the superior court's ruling, certainly given our narrow standard of review – whether the ruling was a reasonable application of the *Strickland* standard.

Petitioner's second claim is that trial counsel was ineffective in failing to object to the prosecutor's remarks during closing argument that violated Petitioner's Fifth Amendment right to remain silent and his Sixth Amendment right to counsel. As noted, as part of his closing, the prosecutor remarked that Petitioner requested to see a lawyer and that "when somebody asks for an attorney that ends the interview. You cannot interview someone anymore." He also mentioned Officer Handerhan's testimony that Petitioner had refused to give a written statement.

Citing *Commonwealth v. Copenhefer*, 553 Pa. 285, 719 A.2d 242 (1998), the superior court decided that counsel had a reasonable basis for not objecting to these remarks because they were a fair response to the defense claim that the two police officers were not credible.[16] This ruling is not an unreasonable application of federal law, and it also disposes of any Sixth Amendment claim. As Respondents note in their answer, *Copenhefer* relies on *United States v. Robinson*, 485 U.S. 25, 32, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988), which held that a prosecutor's reference to a defendant's failure to testify at trial did not violate the Fifth Amendment when it was a fair response to a claim by the defendant. *Id.* at 32, 108 S.Ct. at 869. *See also Beneshunas v. Klem*, 137 Fed. Appx. 510, 515-16 (3d Cir. 2005) (nonprecedential) (prosecutor's reference in his closing to the police chief's testimony that the defendant asked for a lawyer and terminated the interview was a fair response to the defendant's testimony that he just wanted to cooperate and tell the police what had happened and had not ended the interview).

---

[16] We add that they were also a fair response to any trial strategy presenting Petitioner as cooperative during the investigation.

IV.  *Conclusion*

        We will issue an order denying the section 2254 petition. The order will also deny a certificate of appealability, based on the analysis in this memorandum. However, Petitioner is advised that he has the right for thirty (30) days to appeal our order denying his 2254 petition, *see* 28 U.S.C. § 2253(a); Fed. R. App. P. 4(a)(1)(A), and that our denial of a certificate of appealability does not prevent him from doing so, as long as he also seeks a certificate of appealability from the court of appeals. *See* Federal Rule of Appellate Procedure 22; Local Rule of Appellate Procedure 22.1.


                                        /s/William W. Caldwell
                                        William W. Caldwell
                                        United States District Judge

Date: September 18, 2009

UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA


JOSEPH ANDREW MIRARCHI,           :
                                  :
     Petitioner,                  :
                                  :   CIVIL NO. 1:CV-08-1712
        vs.                       :
                                  :   (Judge Caldwell)
RANDALL BRITTON, et al.,          :
                                  :
     Respondents.                 :


*O R D E R*


        AND NOW, this 18th day of September, 2009, it is ordered
that:

        1.  The petition (doc. 1) for a writ of
habeas corpus under 28 U.S.C. § 2254 is
denied.

        2.  A certificate of appealability is
denied.

        3.  The Clerk of Court shall close this
file.


                          /s/William W. Caldwell
                          William W. Caldwell
                          United States District Judge